**<u>EXHIBIT B</u>**

**Affidavit of Christopher Michael Nacson**

Applicant
Christopher Michael Nacson
Second Affidavit
5 November 2013
Exhibit MN-2

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

                            **CAUSE NO: FSD      OF 2013 (AEFJ)**

**IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)**

**AND IN THE MATTER OF SUNTECH POWER HOLDINGS CO., LTD.**

---

## SECOND AFFIDAVIT OF CHRISTOPHER MICHAEL NACSON

I, **CHRISTOPHER MICHAEL NACSON** of 39/40 Land and House, Amphur Muang, Khon Kaen, Thailand 40000, MAKE OATH AND SAY as follows:

**A      INTRODUCTION**

1      I am and have been since 26 July 2013, a director of Suntech Power Holdings Co., Ltd. (**"Suntech"**). I have held the position of Chairman of the Board of Directors of Suntech since 27 August 2013. By way of my professional background, I have more than 25 years of senior management and board-level experience in the Asia-Pacific region and have worked extensively with businesses with distressed debt which are undergoing corporate restructuring. As I explain further below, I was appointed to the Board of Directors at the request of certain large creditors of Suntech on the basis that my previous restructuring experience would assist Suntech with its restructuring efforts. Since my appointment, I have become familiar with the day-to-day operations, financial condition, business affairs and books and records of Suntech.

2      The facts and matters set out in this affidavit that are within my own personal knowledge are true and correct. Where the contents of this affidavit are not within my own personal

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

knowledge, they are based on my own review of the relevant documents and/or discussions with relevant directors, officers, employees and advisors of Suntech or its subsidiaries, as appropriate. Save as aforesaid, I have stated the source of my knowledge and such facts are true and correct to the best of my information and belief.

3    There is now produced and shown to me marked "**MN-2**" a paginated bundle of documents to which I shall refer where appropriate. Where I refer to a page number in this affidavit, the reference is to a page in that exhibit unless otherwise appears from the context.

4    Suntech is cash flow insolvent and may also be balance sheet insolvent. Two of its key subsidiaries, namely Wuxi Suntech Power Co. Ltd ("**Wuxi Suntech**"), a company incorporated in the People's Republic of China ("**PRC**") and Suntech Power International Limited ("**SPI**"), a company incorporated in Switzerland are also insolvent, and are in formal, court-supervised restructuring processes in their respective jurisdictions. However, for the reasons set out below, Suntech believes that given a further period of time, it will be possible to achieve a restructuring to return Suntech and its subsidiaries (the "**Group**") to solvency.

5    Accordingly, I am duly authorised by Suntech to make this affidavit on its behalf in support of its Summons seeking the appointment of David Walker and Ian Stokoe of PwC Corporate Finance & Recovery (Cayman) Limited, George Town, Grand Cayman as joint provisional liquidators ("**JPLs**") pursuant to section 104(3) of the Companies Law (2013 Revision) (the "**Companies Law**").

**B    SUMMARY**

6    As explained further below, the Group is one of the world's leading manufacturers of solar panels and the shares of Suntech, which is the ultimate holding company of the Group, are listed on the New York Stock Exchange ("**NYSE**"). Suntech's American Depositary Shares (each of which represent one ordinary share of a par value of US$0.01) were trading at US$1.32 on 1 November 2013 which is down from a 52-week high of US$1.80 on 4 January 2013. Suntech's market capitalisation as at the date of swearing this affidavit is US$271.27 million.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

2

7       As stated in paragraph 4 above, the Group is in serious financial difficulty and Suntech itself is also cash flow insolvent.  As set out more fully in my first affidavit, it owes the sum of approximately US$16,666.00 to me as the Petitioner.  In addition, Suntech has a liability of approximately US$541 million plus interest pursuant to the terms of certain New York law governed, 3.00% convertible senior notes, issued by Suntech on 17 March 2008 to various investors ("**Notes**") [1].  The beneficial holders of the Notes are referred to herein as "**Noteholders**". Suntech accepts that this sum fell due on 15 March 2013 and that it is unable to pay this debt.  Since then, Noteholders representing between 50% to 58% of the Notes, have at various times agreed to forbear from taking any action against Suntech under the Notes.  These forbearances are described further below.

8       When Suntech defaulted on this payment under the Notes it triggered cross-defaults under (i) its other outstanding debt, including a US$50 million convertible loan with International Financial Corporation ("**IFC**") pursuant to a loan agreement dated 30 June 2009 (which Suntech accepts has become due to IFC), and (ii) certain loans provided by Chinese lenders to Suntech's subsidiaries.  In addition, Suntech may have other substantial liabilities, subject to available defences, under guarantees it gave in respect of certain of its subsidiaries' liabilities to third parties.  The amount of Suntech's liabilities under the guarantees, if any, is not certain.

9       On 14 October 2013, an involuntary petition for bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code (the "**Chapter 7 Proceedings**") was filed against Suntech in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") by four Noteholders: Trondheim Capital Partners L.P.; Mr Michael Meixler; Longball Holdings LLC; and Jiangsu Liquidators, LLC (who represent approximately 0.3% of the outstanding principal of the Notes) (the "**Chapter 7 Petitioners**"), the latter two having only taken assignment of their Notes, respectively, one day prior to and on the day of the filing of the involuntary petition).  The petition amount of US$1,578,230.68 includes: (i) US$567,905.34 in judgments obtained by Trondheim Capital Partners L.P., Michael Meixler; (ii) US$10,325.68 in judgments obtained by Marcus and Jessica Dugaw (rights assigned to

---

[1] The Notes are held by the underlying Noteholders beneficially through Wilmington Trust Company as trustee.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

Longball Holdings LLC) and (iii) $1,000,000 of the principal amount of the Notes held by A&T SPV LLC (rights assigned to Jiangsu Liquidators, LLC).

10    Under the rules of the Bankruptcy Court, Suntech has until 6 November 2013 to either file a responsive pleading to the motion – either a motion to dismiss or an "answer" (in effect, a defence, setting out its substantive response to the Chapter 7 Petition). The Chapter 7 Proceedings are described further in the Affidavit of Peter Friedman.

11    However, over the past 12 months, Suntech has been in negotiations with certain other of its Noteholders in an effort to reach a consensual restructuring of the Notes. I am informed by Messers Bingham McCutchen LLP, counsel to the supporting group of Noteholders, that those Noteholders have constituted an *ad hoc* group led by Clearwater Capital Partners, LLC ("**Clearwater**") (a significant Noteholder), who are further supported by another significant Noteholder, Spinnaker Capital Limited ("**Spinnaker**") and other Noteholders, and who together represent over 62.4% of the Notes.

12    Together with the Clearwater and Spinnaker, Suntech has also been in talks with the IFC and potential third party investors, with a view to obtaining new capital investment, compromising the Notes and implementing a restructuring of the Group. IFC, Clearwater and Spinnaker have formed a creditors working group ("**CWG**") for the purpose of these discussions. The CWG is working closely with other Noteholders whose holdings, together with Clearwater and Spinnaker, represent in aggregate over 62.4% of the Notes. Suntech does not know the exact composition or percentage holdings of this group as at the date of swearing hereof, because the composition of this group may change from time to time. However, Clearwater and Spinnaker, who hold over 48% of the Notes as I understand from Messers Bingham McCutchen LLP, continue to support Suntech's restructuring efforts.

13    On 23 September 2013, Suntech entered into a Hong Kong law governed restructuring framework agreement with Clearwater and Spinnaker (the "**RFA**"). The RFA sets out, at a high level, the key terms for a proposed restructuring that would include a debt for equity swap for the Noteholders and the IFC loan and envisions the introduction of an equity contribution from a new investor.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

14      To allow the negotiations to progress, Clearwater, Spinnaker and other Noteholders executed various forbearance agreements from time to time agreeing to forbear from exercising their rights under the Notes, the most recent forbearance agreement being contained in the RFA. However, the RFA and the forbearance provisions contained therein have since terminated in accordance with their terms.

15      At the time of signing the RFA, Suntech had not received any firm expressions of intent from potential third party investors who would be willing to provide a fresh injection of capital into Suntech.

16      However, discussions with potential investors have now progressed and on 24 October 2013, Suntech received a non-binding letter of intent from Wuxi Guolian Development (Group) Co., Ltd. ("**Guolian**"), an investment company owned by the local Chinese government of Wuxi, PRC. Guolian has expressed its intention to make an equity investment into Suntech of not less than US$150 million in cash, together with causing solar and other businesses it owns to be injected into Suntech and/or enter into joint venture or similar arrangements with the Suntech to take advantage of the Suntech's global platform, distribution networks, and other synergies, in return for acquiring the majority share interest in Suntech. Such investment is expressed to be conditional upon a successful restructuring of Suntech's liabilities under the Notes and IFC loan.

17      Notwithstanding that the RFA has terminated, Clearwater, Spinnaker and IFC remain supportive of the restructuring efforts and of this application. I have been informed by them that they intend to appear by counsel at the hearing of the application to appoint the JPLs, to confirm their support.

18      Suntech therefore intends to seek the dismissal of the Chapter 7 Proceedings on the grounds that the Board believes that there is a realistic chance of achieving a restructuring and recapitalisation of Suntech which would result in a more advantageous return to all of Suntech's stakeholders, including the Chapter 7 Petitioners. In addition, Suntech intends to seek the dismissal of the Chapter 7 Proceedings on the grounds that the petition does not comply with the requirements under the U.S. Bankruptcy Code together with a number of other grounds.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

## C    STRUCTURE AND BUSINESS OF THE SUNTECH GROUP

19    Suntech was incorporated in the Cayman Islands on 8 August 2005 as an exempt company limited by shares.  Copies of Suntech's certificate of incorporation and memorandum and articles of association appear at pages 1 - 50.

20    In addition to myself, the other directors of Suntech are Dr. Zhengrong Shi, Philip Fan, Zhou Weiping, Kurt Metzger and David King.  Mr Zhou Weiping and Mr Philip Fan were appointed to the Board on 19 March 2013.  Mr Zhou is serving as the interim CEO and CFO of Suntech.  Mr Metzger and I were appointed to the Board on 25 and 26 July 2013, respectively, pursuant to the RFA upon the nomination of certain Noteholders, on the basis that our previous restructuring experience would assist Suntech with its restructuring efforts.

21    Suntech's shares have been publicly listed on the NYSE since 14 December 2005 under the symbol "STP" and its shares are traded through the use of American Depositary Shares ("**ADS**").

22    As I describe further at paragraph 39 below, as well as acting as the holding company for the Group, Suntech is responsible for raising financing for the Group and is the provider of guarantees for certain of its subsidiaries.  It also holds minority equity investments in a number of the Group's suppliers.

23    The Group is one of the leading photovoltaic ("**PV**") solar manufacturers in the world. Photovoltaic technology is a means of generating electrical power from solar radiation.  The Group develops and manufactures PV components and systems (i.e. solar panels and associated equipment and technology).  The Group also provides system integration services to customers and support services for utility scale PV systems.

24    The principal operating subsidiaries of the Group carry on their business in the PRC, Europe, Japan, and the United States.  A corporate structure chart for the Group as at 30 June 2013 appears at page 51.  The members of the Group with substantial operations, all of which are indirect wholly owned subsidiaries of Suntech, are (i) Wuxi Suntech, a company incorporated in the PRC; (ii) SPI, a company incorporated in Switzerland; (iii) Suntech Energy Engineering Co., Ltd, a company incorporated in the PRC; (iv) Suntech Power Japan Corporation, a

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

company incorporated in Japan; and (v) Suntech America Inc., a company incorporated in the state of Delaware ("**Suntech America**").

25    As I explain further below, due to the financial difficulties faced by the Group, its operations have reduced considerably over the past 12 months. In particular, Wuxi Suntech was placed into administration in the PRC on 21 March 2013, on the application of certain of its creditors, and SPI applied for a provisional moratorium in Switzerland on 8 April 2013.

26    The Group sells products in various countries and regions worldwide including Germany, Italy, Spain, France, Benelux, Greece, the United States, Canada, PRC, the Middle East, Australia and Japan. The Group sells its products both through distributors and directly to end users through local sales offices in a number of countries.

27    The four main business units of the Group are manufacturing, system integration, research and development, and sales and marketing:

    27.1    Manufacturing activities are primarily carried out in the PRC through Wuxi Suntech and other subsidiaries. Wuxi Suntech is a wholly owned indirect subsidiary of Suntech.

    27.2    System integration services include the design, installation, commissioning and testing of PV systems through services such as planning, engineering, procurement of permits and equipment, construction management, monitoring and maintenance. These activities are mainly conducted through Suntech Energy Engineering Co., Ltd, and to a lesser extent Suntech America, both being wholly owned indirect subsidiaries of Suntech.

    27.3    Research and development is carried out through Wuxi Suntech and other subsidiaries in Wuxi, PRC. The Group has also established cooperative relationships with a number of universities in the PRC and elsewhere.

    27.4    Sales and marketing activities are carried out by subsidiaries in the relevant local markets. The main subsidiaries of Suntech that are involved in direct sales to customers are SPI, Suntech Power Japan Corporation, Suntech Australia Pty. Ltd.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

7

(incorporated in and operating from Australia), Suntech Power Korea Co., Ltd. (incorporated in and operating from South Korea), and Suntech America (operating from California).

28    Although Suntech itself has no employees, as of 30 September 2013 the Group had 5,674 employees in total. The majority of these employees are involved in manufacturing and engineering operations, with the remainder involved in quality assurance, administration, purchasing and logistics, research and development and sales and marketing. The majority of these employees are employed by Wuxi Suntech. The remainder are employed by other subsidiaries in Asia, Australia, Europe, and the United States. The Group also employs independent contractors to support its manufacturing, research and development and sales and marketing activities.

29    The Group has substantial and valuable intellectual property, comprising registered and unregistered intellectual property (e.g. patents, trademarks, domain names, copyright, licences and proprietary trade secrets). For instance, the Group currently has a total of 327 registered patents and 170 pending patent applications, nearly 400 registered trademarks and nearly 70 domain names. The intellectual property rights are held by Wuxi Suntech, Suntech Power Japan Corporation, and Kuttler Automation Systems (Suzhou) Co., Ltd.

**D    BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES**

30    Since 2011 the Group has been experiencing significant operating losses and has been operating at a significant working capital deficit (i.e. its total consolidated current liabilities exceeded its total consolidated current assets). As of 31 March 2012 (the latest date for which full balance sheet figures are available – see section E below), the Group had a working capital deficit of approximately US$1.1 billion. The Board believes that this deficit has increased significantly since 31 March 2012 and continues to do so. The Group's working capital and liquidity condition have been negatively affected by a number of factors, including:

30.1    Lower demand for PV products, due in large part to a reduction in government subsidies to solar power plants in key European markets, such as Spain and Germany;

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

8

30.2    Lower average selling prices for PV products, largely due to oversupply in the PV market resulting from rapid growth in the global production and supply of PV cell and PV module products in recent years;

30.3    Borrowing to fund the Group's manufacturing, research and development capacity over 2008 to 2010;

30.4    The imposition by the US (in November 2012) and EU (in June 2013) of substantial import duties on crystalline silicon PV cells manufactured in the PRC;

30.5    Various proceedings brought against the Group that I describe further below; and

30.6    The entering into fixed-price, long-term, supply agreements by the Group for the supply of polysilicon and silicon wafers (which are key components of PV systems) at prices which are now well above current market prices.

31    As explained further below, these financial difficulties led to Wuxi Suntech and SPI entering into administration proceedings earlier this year.

**E    GROUP FINANCIAL STATEMENTS**

32    The last audited consolidated financial statements for the Group were for the year ending December 2011.  A copy of Suntech's Annual Report for the year ending December 2011 is at pages 55 to 193, the audited financial statements are at page 147.

33    However, the financial information and financial statements for the years 2010, 2011 and the first quarter of 2012 is currently in the process of being re-stated for the following reasons:

33.1    In April 2010 and July 2010 in connection with the development of PV projects in Italy, Solar Puglia II S.a.r.l ("**Solar Puglia**"), a wholly owned subsidiary of Global Solar Fund, S.C.A, Sicar (the "**GSF Fund**"), entered into a €354.2 million facility agreement (of which only €325 million has been drawn) and a €200 million master lease agreement with an affiliate of the China Development Bank.  Those finance facilities were secured by all of the assets of Solar Puglia.  Because Suntech was a significant investor in the GSF Fund, it agreed to guarantee the payment obligations

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

9

under each of the finance facilities and to keep funds sufficient to cover one instalment payment of amounts due under the finance facilities on deposit in cash collateral accounts with certain commercial banks as additional security. There are several cash collateral accounts which Suntech has pledged to the China Development Bank, the amounts in which have already been substantially drawn.

33.2    As security for Suntech's obligations under the guarantees, Suntech believed that it had received a pledge of €560 million in German government bonds from GSF Capital PTE, Ltd., the parent of the general partner of the GSF Fund. However, on 7 December 2012 Suntech announced that it had concluded that the security interest did not exist and that Suntech had been a victim of fraud. As a result, Suntech commenced proceedings against GSF Capital in Singapore and the United Kingdom seeking damages. These proceedings have now been settled and a wholly-owned subsidiary of Suntech has been appointed as the new general partner of GSF so that Suntech has been able to exercise operational control of GSF since March 2013.

33.3    As a result of the fraud, Suntech also announced on 7 December 2012 that the Group's financial information for 2010, 2011 and the first quarter 2012 and the annual consolidated financial statements for 2010 and 2011, together with the accompanying reports of the Group's independent accounting firm for 2010 and 2011, need to be restated.

34    Suntech is working closely with its auditors, Deloitte Touche Tohmatsu CPA Ltd, in respect of the restatement of its financial statements and anticipates that it will be in a position to release the restated 2010 and 2011 financial statements by 28 February 2014, and to release its Form 20-F Annual Reports for 2012 and 2013 to the NYSE on 31 March and 30 April 2014, respectively.

35    Suntech has publicly released preliminary unaudited financial results for 2012, copies of which appear at pages 194 - 199.

**F    FINANCIAL POSITION OF SUNTECH**

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

36    Given the need for Suntech's financials to be restated, some of the financial information set out below for Suntech is estimated only. However, these are best estimates based on currently available information and are included for the purpose of providing this Honourable Court with an overview of the assets and liabilities of Suntech.

37    As of 30 September 2013, Suntech holds cash deposits of approx. US$4.3 million, of which approx. US$2.7 million is restricted cash. The restricted cash relates to cash that is held in three deposit accounts as security for Solar Puglia's obligations set out at paragraph 33.1 above.

38    Its other primary assets comprise its shares in its subsidiaries and certain minority interests that it holds in certain suppliers. According to unaudited figures available, as at 30 June 2013, Suntech also had approximately US$1.5 billion in intercompany receivables and loans due from certain of its subsidiaries. However, due to financial difficulties of Suntech's subsidiaries, it is unclear how much of this amount will be recoverable.

39    Based on unaudited figures available, as of 30 June 2013, Suntech had unsecured liabilities of approximately US$1.13 billion together with contingent liabilities of approximately US$1.22 billion comprising of guarantee obligations for certain of its subsidiaries. Suntech has no secured liabilities.

40    Suntech's unsecured liabilities relate to:

40.1    US$541 million plus interest due under the Notes. A copy of the indenture, pursuant to which Suntech issued the Notes, appears at pages 200 - 267;

40.2    US$50 million due under the convertible loan with IFC dated 30 June 2009. A copy of this loan appears at pages 268 - 357;

40.3    Approximately US$488 million of intra-group debts owed to its subsidiaries pursuant to certain intercompany loan agreements and debts arising from payments made by its subsidiaries to third party creditors on Suntech's behalf;

40.4    Other liabilities of US$5.8 million comprising other payables and long-term liabilities.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

41    Suntech has contingent liabilities under certain guarantees, namely:

41.1   €554.2 million under a guarantee in favour of China Development Bank ("**CDB**") in relation to financing provided by CDB to the GSF Fund;

41.2   US$560 million under a guarantee to Mesquite Solar 1 LLC, a Delaware joint venture company, for the performance and warranty obligations of Suntech America Inc. under an Engineering, Procurement and Construction Contract;

41.3   €216.1 million for outstanding claims made under a supply agreement between Wacker Chemie AG and SPI guaranteed by Suntech. It is anticipated that this claim against SPI will be compromised as part of the SPI administration;

41.4   US$48.1 million for the delivery obligations of Suntech America Inc. under a solar module supply agreement with AMEC Kamtech guaranteed by Suntech; and

41.5   RMB 180 million (approx. US$29.5 million) for all the obligations of Suntech Power Co. Ltd to RBS Leasing (China) under a guarantee given by Suntech.

42    In addition, in October 2012, Suntech entered into a guarantee in favour of Bank of China, China Development Bank, Industrial and Commercial Bank of China, Agricultural Bank of China and Bank of Jiangsu (collectively "**Bank Group**"), in respect of the obligations of Wuxi Suntech under a credit facility agreement in the amount of RMB8.6 billion (approximately US$1.3 billion) ("**Credit Facility Agreement**"). It is uncertain what liability Suntech has, if any, under this guarantee.

43    The amounts stated above are not necessarily the amounts that would be payable by Suntech as (a) the primary obligors may have assets which would reduce or extinguish the claim under the guarantee; (b) some of these claims may be compromised or settled in the context of the Chinese or Swiss restructuring proceedings; or (c) Suntech may have defences to such claims.

44    Suntech is also defending various legal proceedings as follows:

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

44.1    The Chapter 7 Proceedings:  *In re Suntech Power Holdings Co., Ltd*, United States
Bankruptcy Court for the Southern District of New York, Case No. 13-13350:

(a)    On 14 October 2013, the Chapter 7 Proceedings were filed against Suntech in
the Southern District of New York by the Chapter 7 Petitioners holding in
aggregate approximately $1.6 million of the Notes.  A copy of the Chapter 7
petition appears at pages 358 - 384.

(b)    Suntech intends to seek the dismissal of the Chapter 7 Proceedings and
intends to file a motion to dismiss before the deadline on 6 November 2013.
Further detail of the Chapter 7 Proceedings and the motion to dismiss is set
out in the Affidavit of Peter Friedman.

44.2    *Trondheim Capital Partners, L.P. and Michael Meixler v Suntech Power Holdings Co.,
Ltd.*, District Court for the Southern District of New York,   Case No 13-CV-4668
(RPP)(DF):

(a)    These proceedings were filed by two minority Noteholders on 10 June 2013
against Suntech seeking payment of the amount of US$550,000 plus interest
due to them pursuant to the terms of the Notes.  On 19 September 2013 the
Court entered judgment against Suntech in the amount of US$500,000 and
US$50,000 plus interest to first and second plaintiffs, respectively.

(b)    On 21 October 2013 Suntech filed an appeal against this judgment to the
United States Court of Appeals for the Second Circuit.  As at today's date, no
hearing date has been fixed for this appeal.   There is no stay against
execution of the judgment pending this appeal however all further actions
against Suntech have been stayed pursuant to the Chapter 7 Proceedings.

44.3    *Marcus & Jessica Dugaw, Husband and Wife, and the Marital Community Composed
thereof v Suntech Power Holdings Co.*, Ltd., New York District Court, Case No. 13-
CV-5608 (RPP)(DF):

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand
Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

(a)     These proceedings are similar to those mentioned in paragraph 44.2 above, in that they were brought by minority Noteholders against Suntech for the return of the principal amount due to the plaintiffs on the Notes. On 19 September 2013 the Court entered judgment against Suntech in the amount of US$10,000 plus interest.

(b)     On 21 October 2013 Suntech filed an appeal against this judgment to the United States Court of Appeals for the Second Circuit. As at today's date, no hearing date has been fixed for this appeal. There is no stay against execution of the judgment pending this appeal however all further actions against Suntech have been stayed pursuant to the Chapter 7 Proceedings.

44.4    *Energy Conversion Devices Liquidation Trust, by and through its Liquidating Trustee, John Madden v Trina Solar Limited, Trina Solar (U.S.), Inc., Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Suntech Power Holdings Co., Ltd., Suntech America, Inc.*, U.S. District Court Eastern District of Michigan Southern Division, Civil Action No. 13-cv-14241:

(a)     On 4 October 2013 the trustee for Energy Conversion Devices filed a complaint alleging that Suntech and the other named defendants agreed to artificially fix prices and coordinate amongst themselves to sell PV products in the American market at unreasonably low and/or below cost prices, asserting claims for violation of Section 1 of the U.S. Federal Sherman Act and Michigan's Antitrust Reform Act Section 445.772.

(b)     All further actions against Suntech were stayed pursuant to the Chapter 7 Proceedings.

44.5    *Solyndra LLC ("Solyndra") vs. Suntech Power Holdings Co., Ltd., Suntech America, Inc., Trina Solar Limited, Trina Solar (U.S.), Inc., Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc.*, U.S. District Court for the Northern District of California (**"California District Court"**), Case No. 12-5272:

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

(a)  On 11 October 2012, Solyndra filed a complaint against Suntech and the other named defendants alleging, among other things, that the defendants flooded the US solar market with solar panels at below cost prices and ran an illegal cartel. Solyndra seeks not less than US$1.5 billion in damages, plus penalties and other monetary relief. On 8 March 2013 Suntech and other named defendants applied to have this action summarily dismissed.

(b)  A ruling on Suntech's application was not expected until late 2013 or early 2014, however, all further actions against Suntech were stayed pursuant to the Chapter 7 Proceedings.

44.6  *Scott Bruce v. Suntech Power Holdings Co., Ltd.*, U.S. District Court for the Northern District of California, Case No. 12-4061:

(a)  These proceedings were filed on 1 August 2012. This is a class action that has been filed on behalf of purchasers of the holders of Suntech's ADSs between 18 August 2010 and 30 July 2012. On 5 February 2013 the Complaint was amended to add as plaintiffs purchasers of 3% convertible bonds between 6 April 2010 and 30 July 2012. The plaintiffs seek damages under the U.S. Securities and Exchange Act of 1934 arising out of losses alleged to have been incurred as a result of allegedly false or misleading statements made regarding the GSF transaction described above.

(b)  Dr. Shi, David King, and Amy Zhang (the former chief financial officer) are co-defendants.

(c)  Suntech has filed a motion to dismiss. Oral argument was scheduled for 7 November 2013, but on 21 October 2013 these proceedings were stayed as a result of the Chapter 7 Proceedings.

44.7  *Kent Ji v. Zhengrong Shi, et al.*, California District Court, Case No. 12-6409:

(a)  These proceedings were filed on 18 December 2012. This is a class action on behalf of shareholders of Suntech, alleging that the individual defendants (all

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

of whom are directors or former directors of Suntech) breached their fiduciary duties to Suntech. The individual defendants include Dr. Shi, David King, Julian Worley, Zhizhong Qiu and Susan Wang-Wade. Suntech is a nominal defendant and the action is purportedly brought as a derivative action on behalf of Suntech.

(b)    The complaint generally asserts that since 2007, Dr. Shi has (among other things) pressured Suntech to enter into transactions with Asia Silicon, a company controlled by Dr. Shi, on commercially unreasonable terms (including paying for supplies at above-market rates using an advance-payment arrangement unusual in the industry, by providing Asia Silicon with a $10 million interest-free loan, and by causing Suntech to provide legal and investment banking services to Asia Silicon at no cost), and that the board approved these transactions notwithstanding their unreasonable terms.

(c)    The causes of action include (1) one count for breach of fiduciary duty and "equitable fraud" against all the individual defendants, and (2) a count for corporate waste and equitable fraud against all individual defendants. The complaint seeks damages, injunctive relief, and an award of reasonable attorney's fees and costs.

(d)    The parties have agreed to stay the litigation pending mediation, with the mediation scheduled for 23 October 2013. However, on 21 October 2013 these proceedings were stayed as a result of the Chapter 7 Proceedings.

45    Accordingly, Suntech is insolvent on a cash flow basis because it is unable to pay the debt due to me, as the Petitioner and its other liabilities that are due and payable, including those due to the Noteholders and IFC.

46    Suntech may also be insolvent on a balance sheet basis depending on the outcome of the re-statement of the financial statements, the outcome of the various legal proceedings and the value that could be achieved from the sale of its shares in its subsidiaries.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

16

47    Suntech's main creditors and contingent creditors are located in the United States, the PRC, Switzerland, Germany, Australia, and the British Virgin Islands.

**G    RESTRUCTURING OF WUXI SUNTECH**

48    Wuxi Suntech and its subsidiaries carry out the manufacturing activities of the Group.

49    As noted at paragraph 42 above, Wuxi Suntech owes the Bank Group the sum of US$1.3 billion under the Credit Facility.  This debt was due on 31 March 2013 and it was clear before that time that Wuxi Suntech was not going to be in a position to make this payment.

50    On 18 March 2013, the Bank Group together with Bank of Shanghai Co. Ltd, Standard Chartered Bank (China) Limited, Nanyang Commercial Bank (China) Limited and China Everbright Bank Co. Ltd, petitioned the Wuxi Municipal Intermediate People's Court in Jiangsu Province, PRC ("**Wuxi Court**") for the reorganisation of Wuxi Suntech and the appointment of administrators pursuant to the Enterprise Bankruptcy Law of the PRC.

51    On 21 March 2013, the Wuxi Court made the order placing Wuxi Suntech into administration and appointed an administration committee, consisting of local government representatives and accounting and legal professionals ("**Wuxi Administrator**") to administer its restructuring.

52    My explanation of the Wuxi administration proceedings below is based on information provided to me by Dr Shi and from communications received by Suntech from the Wuxi Administrator.

53    The Wuxi Administrator has retained Messrs King & Wood Mallesons, a law firm in the PRC, and Messrs Ernst & Young as its primary legal and financial advisors respectively as well as other local accounting and legal firms for audit and valuation purposes.

54    The process of administration is designed to facilitate an orderly process for Wuxi Suntech and its creditors with a view to restructuring Wuxi Suntech's debt obligations while continuing production and operations, failing which it will be liquidated.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

55    The Wuxi Administrator has now completed a due diligence and competitive bidding process with third party investors seeking offers to invest in Wuxi Suntech and/or to purchase its assets. Guolian participated in this process.

56    On 9 October 2013, by way of a press release, the Wuxi Administrator notified Suntech that Jiangsu Shunfeng Photovoltaic Technology Co., Ltd. ("**Jiangsu Shunfeng**") had been provisionally selected as the successful bidder for all of the assets and equity of Wuxi Suntech. The Wuxi Administrator also stated the successful bidder would be officially selected at a creditors' meeting scheduled for 12 November 2013. From a further Hong Kong Stock Exchange announcement released by Jiangsu Shunfeng on 2 November 2013, it appears that this bid is in the amount of US$493 million. A copy of the Hong Kong Stock Exchange announcement which contains further details of the Jiangsu Shunfeng bid appears at pages 385 - 395.

57    The bid is conditional upon Jiangsu Shunfeng's shareholder approving the acquisition and the Wuxi Administrator obtaining approval for a restructuring plan from the creditors of Wuxi Suntech and the Wuxi Court. On 19 September 2013 the Wuxi Court set a long-stop deadline date of 20 December 2013 for the Wuxi Administrator to submit a restructuring plan to a vote of creditors and then to the Wuxi Court for approval.

58    Assuming the Jiangsu Shunfeng bid and the restructuring plan are approved by creditors and the Wuxi Court, the plan will then become final and binding on Wuxi Suntech, the Wuxi Administrator, Wuxi Suntech's creditors and shareholders and Jiangsu Shunfeng. The plan will then be implemented as soon as is practicable.

59    Jiangsu Shunfeng's bid is for all of the assets of Wuxi Suntech including its manufacturing operations, plant and equipment, stock, work in progress, contracts, subsidiaries, employees, R&D. However, I am advised that the agreement also provides that Jiangsu Shunfeng will acquire the shares in Wuxi Suntech, something that may not be permitted under the PRC proceeding or under BVI law.

60    Nevertheless, if the Jiangsu Shunfeng bid and the restructuring plan are ultimately approved by the Wuxi creditors and the Wuxi Court, the Group's manufacturing operations and research & development assets will be transferred to Jiangsu Shunfeng in their entirety.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

Upon completion of the restructuring plan, the Wuxi Administrator will then pay a dividend to the creditors of Wuxi Suntech and their claims will be compromised.

**H**   **RESTRUCTURING OF SPI**

61   SPI, a company incorporated in Switzerland, is Suntech's principal operating subsidiary in Europe and is primarily responsible for the Group's direct sales to the Group's customers in Europe.

62   On 8 April 2013, SPI applied for a provisional moratorium on creditor claims to the Cantonal Court in Schaffhausen, Switzerland (**"Swiss Cantonal Court"**) pursuant to articles 293 et seq. of the Swiss Federal Act on Debt Enforcement and Bankruptcy with respect to a Swiss corporation (*Aktiengesellschaft*).   My summary of the Swiss proceedings set out below is based on information that I have received from Mr Robert Moon, a consultant engaged by Suntech, acting as chief restructuring officer with respect to the Group's European operations who has been working with SPI's Swiss attorneys, the Swiss Administrator (explained below) and the staff in the various European Group companies since 1 April 2013.

63   I understand that SPI was required under Swiss law to make this application because it was insolvent at both a going concern valuation and liquidation valuation based on the audited interim balance sheet of SPI as of 28 February 2013.   In this regard, SPI's liabilities exceeded its assets by approximately US$444 million on a going concern basis and approximately US$1.3 billion on a liquidation basis.   A copy of this balance sheet appears at pages 396 - 400.   The balance sheet is in German and in the time available it was not possible to obtain an English translation.

64   The majority of SPI's debt, (US$628.4 million) is owed to other entities within the Group. However, it also has substantial obligations to external creditors.

65   On 9 April 2013, following a notice of over-indebtedness having been filed by SPI's auditors with the Swiss Cantonal Court, the Swiss Cantonal Court granted a provisional moratorium for a period of two months and appointed Franco Lorandi, of Messrs Holenstein Attorneys at law Ltd (Swiss attorneys), as administrator (**"Swiss Administrator"**) to assess SPI's financial

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

condition and the prospects of restructuring SPI's debts.  SPI continued its operations during the provisional moratorium period.

66    At the end of the provisional moratorium, in order to avoid liquidation and obtain a definitive moratorium for a further period of six months from the Swiss Cantonal Court, SPI was required to present a plan for immediate profitability, eliminate unprofitable business activities, and implement a substantial downsizing of personnel, operations and expenses. In addition, SPI had to persuade both the Swiss Administrator and the Swiss Cantonal Court that it had realistic prospects for restructuring its balance sheet, that management could competently operate the business in a restructuring environment and that there was a credible plan to successfully exit the moratorium.

67    The steps taken by SPI to satisfy these requirements included changing its business model from a sales intermediary/product distribution model to a services based business model, securing service fee revenues to cover its operating costs and implementing funding plans intended to cover incremental costs of the moratorium. There were reductions in SPI's headcount in 2013 from 37 employees to 9, reductions of other overheads, an initiation of an aggressive effort to collect receivables and movement of cash and inventory to Switzerland.

68    On 18 June 2013 the Swiss Cantonal Court granted SPI a definitive moratorium. SPI is continuing its operations under the supervision of the Swiss Administrator.

69    Since that time, the board of directors of SPI (comprising Dr Zhengrong Shi and Mr Zhou Weiping), together with Mr Robert Moon and the Group's European employees, and under the supervision of the Swiss Administrator, have been formulating a proposal to restructure SPI's debt and a business plan for SPI.  It is expected that a further six-month extension of the definitive moratorium will be sought by SPI in December 2013, in order to consummate and execute the proposed restructuring of SPI (the "**SPI Restructuring Proposal**").

70    It is expected that the SPI Restructuring Proposal will be implemented by a Swiss composition plan (as opposed to a Swiss liquidation) and take the form of a dividend agreement (*Prozent- oder Dividendenvergleich*) where the debtor offers its creditors a partial payment of their claims in satisfaction of the full claim. The Swiss Cantonal Court will only approve such a composition plan if the proposed distributions to SPI's third party creditors

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

under SPI's Restructuring Proposal are in excess of what the third party creditors would receive in a liquidation of SPI. The claims held by related parties of SPI within the Group comprise a large amount of SPI's debts and it is anticipated that these related party creditors will receive a lower dividend that third party creditors as a result of the composition plan. As such, it is anticipated SPI will be able to demonstrate that its third party creditors will receive a higher dividend on the composition plan than on a liquidation. It is also expected that the SPI Restructuring Proposal will shortly be put to SPI's creditors and they will be asked to approve the proposal in January 2014 which would, if approved, return SPI to solvency as a debt free entity and preserve SPI as a wholly owned subsidiary of the Group. Assuming that SPI's creditors were to approve such a proposal, the board of directors of SPI would expect to be able to finalise the restructuring in the first quarter of 2014.

71    After the SPI Restructuring Proposal has been implemented, it is expected that SPI will be an integral part of the sales and distribution activities in Europe, where Suntech's brand continues to exist and be viable. It is also anticipated that the main assets of SPI post-restructuring would comprise:

71.1    The ownership of the Italian, German and US Group entities, which may reasonably be expected to maintain viable sales revenues; and

71.2    An 89% ownership of the GSF Fund.

72    In addition to the financial and operational restructuring at SPI, the board of Suntech has implemented significant changes to the European sales operations as a whole, streamlining the organisation and reducing costs to make it more efficient.

I    **PROPOSED RESTRUCTURING OF SUNTECH**

73    Assuming that Wuxi Suntech's assets are sold to Jiangsu Shunfeng pursuant to the current bid, the key remaining assets of the Group would comprise:

73.1    The European sales and distribution business;

73.2    The US sales and distribution business which also covers Latin America and the Caribbean; and

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

73.3    The GSF Fund.

74    GSF is an investment fund created to make investments in private companies that own or develop projects in the solar energy sector.  As noted above, Suntech owns approximately 89% of the share equity in GSF and controls the general partner of GSF.

75    In August 2012, criminal proceedings were filed in Italy against five of GSF's subsidiaries, alleging that they had illegally built solar farms to exploit state subsidies.  As of 9 October 2013, the Court of Brindisi in Italy had seized 47 sites representing 26.9% of GSF's total generating capacity in connection with these proceedings.  Other GSF subsidiaries are also under investigation.  Accordingly, as of the date hereof, the value of the GSF investment is not clear.

76    However, the sales and distribution businesses operate underneath SPI and, assuming that SPI is successfully restructured as I have described above, the Board expects that they will be solvent and profitable.

77    Accordingly, if Suntech is able to restructure its debt and achieve the injection of fresh capital from Guolian, and thereby return to solvency, the Group intends to move away from manufacturing its own products and instead operate as a seller and distributer of solar products using its existing international sales and distribution platforms.  In this regard, the Group will be able to benefit from the supply of cheap solar panels currently available from competitors in the market.  The Group will also focus on developing its system integration services for residential and commercial customers, which has historically been a more profitable arm of the business. The Group may also consider entering into outsourcing arrangements to manufacture product, including potentially with Jiangsu Shunfeng and re-commencing research and development.

78    To this end, as noted above, since November 2012, Suntech and Wuxi Suntech have been negotiating with Guolian, IFC, Clearwater, Spinnaker and other Noteholders with a view to seeking an agreement to restructure the Group's debt and obtain an injection of fresh capital into Suntech that would be acceptable to a substantial majority of the Noteholders and IFC.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

79     The CWG was constituted in April 2013 to assist Suntech in devising and implementing a comprehensive restructuring of the Group's financial and operational affairs, including a restructuring of the Notes and the IFC loan.   Since that time, the CWG has been in discussions with Guolian and Suntech to determine whether restructuring terms can be agreed with a view to Guolian providing fresh capital for Suntech.

80     In order to allow these discussions to take place, Suntech entered into a forbearance agreement with Noteholders holding not less than 63% of the aggregate outstanding Notes on 7 March 2013 with a long-stop termination date of 15 May 2013, pursuant to which the forbearing Noteholders agreed not to exercise their rights under the Notes and the related indenture subject to certain market-standard termination events.   Two further forbearance agreements were entered into, the second on 15 March 2013 with Noteholders holding not less than 50% of the aggregate outstanding Notes with long-stop termination date of 28 June 2013, and the third on 28 June 2013 with Noteholders holding not less than 50% of the aggregate outstanding Notes with long-stop termination date of 30 August 2013. Each of the forbearance agreements have now expired.

81     The RFA also contains forbearance provisions with the Noteholder signatories agreeing to an extension of the long-stop termination date until 30 November 2013.   However, the forbearance provisions expire automatically upon the occurrence of certain events, including the filing of a bankruptcy proceeding against Suntech not dismissed or stayed within 14 days and the execution of an agreement for the disposition of Wuxi Suntech assets without the prior approval of the CWG.   Accordingly, although the RFA was terminated following the institution of the Chapter 7 Proceedings, Suntech's efforts are supported by Clearwater and Spinnaker.   Nevertheless, the forbearance agreements and RFA have enabled the Board to continue to work with the Noteholders on potential restructuring proposals.

82     Guolian has been heavily involved in these restructuring discussions and, since the Notes became due, has indicated that it may be prepared to invest in Suntech to help achieve a successful resolution.   As noted above, Mr Zhou Weiping, a former employee of Guolian, was appointed to the Suntech Board to facilitate discussions with the CWG.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

83      Guolian is a state owned investment company based in Wuxi, Jiangsu Province, PRC with primary investments in finance and industry. The industry investments include solar companies, power generation projects, textile industries, waste disposal facilities, and related environmental protection and energy projects. As of the end of 2012, the total assets and net assets of Guolian were approximately US$6.7 billion and US$2.6 billion, respectively.

84      On 23 September 2013, Suntech entered into the RFA with Clearwater and Spinnaker. A copy of this agreement appears at pages 401 - 421. Pursuant to the RFA, the parties agreed, among other things, any restructuring would include the following:

84.1    The Group would continue to operate as a going concern and would maintain its listing on the NYSE;

84.2    The Group would be able to retain certain productive cores assets and business capabilities;

84.3    SPI would be able to discharge the Swiss Administrator and return to the control of its directors as a solvent entity;

84.4    Intra-group claims would be eliminated to the fullest extent possible;

84.5    There would be an equity investment in Suntech by a new investor in an amount not less than US$160 million in cash;

84.6    Suntech's liabilities under the Notes and the IFC loan would be converted to equity for a substantial minority share interest in Suntech.

85      Pursuant to clause 2.5(c) of the RFA, it is proposed that the Notes and the IFC loan would be compromised by way of a Cayman Islands scheme of arrangement. At the time of executing the RFA, it was anticipated that the new investment required for any restructuring would come from Guolian; however Guolian had not given any written assurances at that time.

86      Suntech has now received a Letter of Intent from Guolian, a copy of which appears at pages 422 - 424 ("**Letter of Intent**"). Although the Letter of Intent is not contractually binding, it is an important step in negotiations and provides a strong indication that Guolian is committed

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

24

to the restructuring process. In it, Guolian confirms that it intends to participate in a restructuring of the Group on the following terms:

86.1    Guolian will make an equity investment into Suntech of not less than US$150 million in cash and cause solar and other businesses it owns to be injected into Suntech and/or enter into joint venture or similar arrangements with Suntech to take advantage of Suntech's global platform, distribution networks, and other synergies;

86.2    The Noteholders and IFC will convert their debt into equity of Suntech by way of a Cayman Islands scheme of arrangement in exchange for a substantial minority share interest in Suntech;

86.3    Completion of a restructuring is subject to a number of conditions precedent including successful completion of the SPI restructuring.

87    Although the terms of the Letter of Intent do not entirely meet the requirements of the parties to the RFA, it appears that there is a great deal of common ground as to the overall restructuring of Suntech and the Group as a whole. The Board is satisfied that given a further period of time there is a genuine and realistic prospect that restructuring terms will be agreed between Suntech, Clearwater, Spinnaker, other Noteholders, the IFC and Guolian which could then be implemented by way of a scheme of arrangement.

88    On that assumption, I respectfully draw the Court's attention to the fact that our efforts have the support of Noteholders representing approximately 62.4% of all outstanding Notes. Clearly, if the restructuring were limited to a debt-for-equity swap of the Notes and IFC loan pursuant to a scheme of arrangement under section 86 of the Companies Law, then there would be good prospects that, if these Noteholders and the IFC were to support the proposal, there would be good prospects of achieving the statutory majority required by section 86.

89    If a suitable reorganisation with the Noteholders and IFC can be agreed and implemented, it would be on the basis that Suntech would then return to a position of solvency and, as set out at paragraphs 73 to 77 above the remaining business of the Group would be viable. In addition, Guolian has indicated that it may transfer other businesses into the restructured

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

25

Group to avail of Suntech's distribution networks and global platform.

**H    APPOINTMENT OF JPLS**

90    Given that, until now, a substantial majority of the Noteholders have supported Suntech's restructuring efforts, Suntech had hoped to carry out a scheme of arrangement without the need to appoint provisional liquidators, in order to reduce the costs of the restructuring.

91    However, as I have already stated at paragraph 44.1 above, four Noteholders representing Notes in the amount of US$1.6 million have adopted an aggressive and adversarial approach.    On 10 June 2013, Trondheim Capital Partners LP and Michael Meixler, Noteholders holding US$550,000 between them sued Suntech in the New York Southern District Court for the amounts due to them under the Notes.    On 19 September 2013, the Court granted their application for summary judgment and entered judgment against Suntech in the amount of US$550,000 plus interest.    Suntech appealed this judgment on 21 October 2013.

92    On 14 October 2013 Trondheim Capital Partners LP and Michael Meixler filed the Chapter 7 Proceedings.    In this petition, they were joined by Longball Holdings LLC and Jiangsu Liquidators, LLC, being two other Noteholders, who had taken assignment of their Notes, respectively, one day prior to and on the day of filing the petition for Chapter 7 relief.

93    Suntech is concerned that even if the Bankruptcy Court dismisses the Chapter 7 Petition, it could face further litigation from these creditors or other minority Noteholders seeking to enforce their claims.    In addition, certain of the Chapter 7 Petitioners will still hold judgment debts and they might seek to enforce that against Suntech's assets outside of the United States.

94    Accordingly, Suntech seeks the appointment of JPLs in order to obtain the benefit of the automatic stay and ensure that the JPLs and the Board will have an additional period of time in order to conclude negotiations with the CWG and Guolian and then proceed to implement a scheme of arrangement in an orderly fashion without the risk of creditor litigation dissipating Suntech's resources.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

95    As the Notes are governed by New York law, having consulted O'Melveny & Meyers, Suntech's United States attorneys, the Board is satisfied that, in order to give further protection to Suntech, it may be necessary to seek relief under Chapter 15 of the Bankruptcy Code and a stay of proceedings in the United States pending the implementation of the scheme.

**I    ADVERTISEMENT**

96    The Noteholders and other creditors of Suntech are located throughout the United States, the PRC and Western Europe. Accordingly, as well as advertising notice of the appointment of the JPLs in the Cayman Islands Gazette, it is suggested that notice of the appointment should be published once in the *International Edition of the Wall Street Journal* and the *South China Morning Post* as soon as reasonably practicable.

**J    CONCLUSION**

97    For the reasons set out in this affidavit, I respectfully request that this Honourable Court make the orders sought in the Summons.

SWORN to at                          )
this 5th day of November 2013    )
before me:                           )

Christopher Michael Nacson

Signed

_____
Notary Public          **SIU CHOI FAT**
                       Notary Public, Hong Kong SAR
                       Room 703-4, 7/F, Wing On House,
                       71 Des Voeux Road, Central, HK
                       My Commission is for lifetime.

FILED by Maples and Calder, attorneys for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CDM/JSE/CJM/BWB/677342/28750851)

27